Okay, start the clock. You may proceed. Good afternoon, Your Honors. May it please the Court. Your Honors, today we're here on, as you know, People v. Cindy Shepherd. It's a direct appeal of a first-degree murder, a charge that was tried before our jury, and my client was sentenced to 33 years in the Department of Corrections. We raise two issues on appeal. One is a suppression issue, that is, did the trial court err when it issued an order after the motion to suppress was filed? That is, did it fail to suppress as much as it should have? The other issue is a sentencing issue, which I will describe in detail later. The first issue, the suppression issue, involves interrogation that took place where the St. Clair County Sheriff's Department interrogated Cindy Shepherd over a period of two days after her husband was found dead in their burned family home. The fire took place on the 1st of January 2008. She was questioned on the first day, January 3rd, 2008. The issue on the first day, and what I believe is an issue that I'd like the Court to address, is was she in custody at that period of time? Certainly, it was the opinion of the police officers and ultimately the trial court that she was not in custody on the first day, January 23rd, but I believe that the facts demonstrate that she was certainly in custody and should have been remanded. As the Court knows, to determine whether the defendant is in custody, the Court must determine the total circumstances surrounding the interrogation and whether a reasonable person would believe that they were in custody. The accepted test is really if you were innocent, you were put in her shoes, what would you think? And the St. Clair County Sheriff's Department, I know that, you know, we're in Mount Vernon and there's rural areas all around us, but St. Clair County Sheriff's Department is in Belleville and it's in more of an urban area adjacent to St. Louis and it has two floors. Cindy Shepherd was led upstairs to the second floor, past security, down the hall into a room where, although the door was unlocked, she was led in with two police officers and the door was closed behind her. Certainly, the facts demonstrate that she did not believe and did not feel like she could leave. The Court found that it was a non-custodial interview, um, but the defendant asked to leave several times during that questioning and interrogation and she was not, she was told, sure, sure, okay, okay. She was not told you can't leave. She could go though, right? She could, I guess she could go according to the police officer's order. Her car was there, right? I'm sorry? She had her car? She did drive herself. Or she wanted to go and go if she wanted to. I think that in that position, I would not feel that I could rise out of my chair with two police officers sitting adjacent to me, open the door, go down the hall, go past security, down the stairs and out to the parking lot without being stopped. I don't think that the circumstances really would lead a reasonable person to believe that you could merely leave under those circumstances. The fact is, she did ask to leave several, several times. And they said, no, you can't go. They didn't answer her. Pardon me? They did not answer her directly. They didn't tell her, no, you can't go. Okay, they'll say, we're going to get you out of here. You can go soon. Those types of things. You can't go right now. Never said those words exactly. Never said those words exactly, but certainly when she said, I need to get back to my children. Their, their father had just been killed. They said, no, you can't go. Your kids. She would say, I want to. Did they kill them or that? I'm sorry. The sheriff told her, no, you can't go. Your children. The sheriff would not use those words. They would say, we'll get you out of here. It's, they would have one police officer in the room questioning her. She'd say, I really have to get back to my kids. He'd say, okay, okay. He'd leave the room. She'd sit there. Then another cop would come in and start the questioning all over again. And this happened for hours. Certainly my client is not the most sophisticated or educated woman. She, was there evidence in the record? I mean, how old she was, what her education was, whether she had any disabilities, anything of that nature, your honor to, to tell you that I know exactly, um, would, I do not want to leave a false impression, but I will tell you in her thirties, um, I believe that she may have graduated high school, um, and no college to speak of. Um, she was not working, um, was, uh, home with her Um, should you read? She can read. She can read. She didn't have any mental shortcomings. Not that I'm aware of, your honor. No medication or anything. So not that I'm aware of. Okay. Um, I mean, if we're going down that path, I think that she was a woman that was used to, um, you know, doing what she was told. She did what her husband said and, um, and took care of the kids. And, um, although I would not say that that's the truth for all women and all stay-at-home women by any means, I will tell you that that is, um, although I suppose antiquated, it was a traditional, um, role that she assumed. Um, she, you know, if, if we're, if we're putting someone similarly situated in her shoes, I just do not believe given how many times she asked to go. Did she ask for an attorney that, that day? Um, I do not believe she asked for an attorney that day. And if you do look at the facts. You said she thought she was there at the, uh, sheriff and she couldn't go. I think she didn't think about talking for an attorney. She was not Mirandized at that time, ever. She was not Mirandized ever on that day. She didn't ask for an attorney then? No, I, I, I will tell you, especially when we talk about the facts of the It's better on the fourth day. That if she was not Mirandized that day, there would have been no way that she would have known that she was even entitled to an attorney. She didn't say on the third? Uh, she never said anything about an attorney and just kept saying, I want to go to my children. I need to be with my children. She was there to be questioned about her husband's death. At that point in time, they did not know how he died. So I think they were digging, but they didn't know what they were even digging for. Um, they know that he supposedly died in a fire. It was later that they found out that he was shot and then there was a fire. Um, so she was, um, asking to go several, several times. And like I said, I mean, whether it was, I think it was indirectly, um, the taxes that were used were indirectly designed to keep her there and I know that this is probably beating a dead horse, but I wrote this down specifically. If she was allowed to go, they, they, they would have been, should have let her go if she asked to go, but she did ask to go. So I don't think that she was allowed to go. I think it was a I think that any, any statements she made on that day should be suppressed. Um, getting to, um, day two, the next day. Now this is the day in which, um, at least at some point in time, they determined that this was not just, um, a fire that killed this man. Okay. And someone had shot him and they wanted to find out who it was. Um, they, um, the issue is, is, is not one custody on this day. She was in custody. Trial court found she was in custody. It's fairly clear she was in custody. They had learned through the grapevine that she was at a local Red Cross. They went there and marked cars, collected her. She did not have her car. They drove her back to the same place, let her up the stairs, pass security down the hall and in the same, um, uh, interview room. I, I don't know, to be honest, if the room was locked at that point in time or not, but it was fairly clear. She was in custody. Um, she, the, the court found, um, after trial, trial counsel filed the motion to suppress that her statements were voluntary, um, and that she waived her rights to remain silent. But the court does not address the issue of her Miranda rights. And in that, what I mean by that is that she was read her Miranda rights right when they walked in the door. But let me tell you what she said. Um, it's, it's really interesting what she says. And this kind of goes to, um, my description of her as not sophisticated, not educated, um, and not able to understand her rights. Um, even as right to her the second day, um, let's see. She was read her Miranda rights and she began to ask questions about those rights to the police officers. Investigator Coyne told her, well, it's no big deal. It's just a procedural thing. Cindy responded, just, I mean, she knew it is a big deal because I don't understand. I'm confused. Investigator Coyne again downplayed the significance of her Miranda rights and asked her to sign the Miranda form. And I mean, it's her detriment. She signed that form, but she was very clear. I, I don't understand what didn't know what was going on. I'm sorry. What did she not know what was going on? I can't. Um, although I suppose I've described her to you, but I can't be in her head that day. I can only tell you that that's verbatim what was said. It's not a big deal. It's just procedural. I mean, you know, I, I really think that it's probably the biggest deal, um, that happened that day. Um, sure it's procedural, but it affected everything that came after. It affected any, every decision that she made thereafter. She shouldn't have signed that form if she, if she didn't know what was going on, but she said it out loud. This is a big deal. I don't understand. I am confused. They gloss over it and just continue to, well, start their questioning. Um, I don't know. She, you know, sure. She did not use, first of all, she signed the form and she did not use the magic words of, uh, I'm not signing this and I'm not talking. She read it first, right? I'm sorry. Did you read what it was first before she signed it? Did she read it? I, it is a big deal. I don't understand what I'm signing. Um, and then for whatever reason, whether she felt compelled to do so for maybe the same reasons why she didn't get out of that room the day before she signed, she signed the form. But I think that there's been argument made before this court and other courts in the state is, uh, throughout the years that defendants are compelled or coerced to sign the form. But I don't remember a case where the defendant, sure, signed the form, but says out loud, this is a big deal. I don't know. I don't know what this means. And I'm confused. So I think in that way, um, it's, it is, um, hard to say that she knowingly and okay. Um, and she articulated that to the police officers at that time. Um, certainly it's her duty to invoke her right to an attorney, but she didn't know it. She wouldn't sign it then, right? I can only say that maybe she felt compelled to read this paper here and sign there if you want to. Sure. I don't think it's a knowing and intelligent waiver of the rights though. She doesn't know what's, what's being, what's, what is on the paper. Okay. Um, the second part of this, the second issue, I guess, within this day is even if she properly waived her rights, um, she again has to leave six times during questioning. Um, now certainly I guess I have said that she couldn't wait. Um, but given what she had said earlier in response to, um, the reading of her Miranda rights, could the court and should the me, I don't, I want to invoke my right to remain silent. Um, she expresses concern for her kids, um, that they're, uh, left with someone she feels was inexperienced to watch them. Um, she's ignored. And I guess in explaining this to you, I feel like Cindy and her inexperienced and, um, unsophisticated way was saying, I don't want to talk. I don't want to be here. I, I'm, I'm invoking my rights in every way that she could using the language that she had available to her. Um, again, they do tell her at that time that she can't go home. I mean, I think that legally, um, there's probably no question she was in custody at the time and they do Mirandize her, you know, whether it was proper, I don't know, but she doesn't realize she's in custody. I suppose. Um, they don't say you're under arrest. They don't say any of those things in the middle of the test of the interrogation. They tell her she can go home. Um, again, a police officer leaves the room and, um, another cop comes in and continues to question her. Okay. This happens just, it just ping pongs back and forth for hours. Um, she would repeat her desire to go home. They would tell her they knew she wanted to go home. Um, they would tell her that, or she would tell them that they wanted to leave, be with their kids. They would say, I know, and you can leave soon, but you know, the, the, the interrogation would continue. Um, at some point in time, um, they do tell her that they're holding her for further investigation and that she is formally in custody and they reread, reread her Miranda rights to her again. Uh, Cindy repeatedly tells the investigator over the next hour that she wants to leave. And she even says, um, she tells the investigator that she, she needs legal counsel. Um, nevertheless, he ignores her statement of desire for legal counsel and takes her outside the kind of switch locations. They leave the, the, the room and go to this, uh, roof area where they can smoke. At that point in time, it switches from videotape to audio tape. And, um, within the first 25 seconds of the beginning of that tape, Cindy asks whether she should talk to a lawyer. Um, the questioning continues again. Um, once back in the, um, interrogation room, Cindy says she needed to talk to an attorney and determine what charges she's facing. Again, the, um, police officers, uh, ignore those requests, um, to for a lawyer. Um, she definitively says she wants a lawyer and it's ignored. And the questioning continues. The fact is that the police officers didn't care about defendants' rights at that, throughout that day. Um, it's not just at that moment when she asks for an attorney that they don't care and continue questioning. Um, it's really throughout the day that they were going to continue questioning this woman until they got what they wanted. And you can go back to questioning her despite her invocation of her rights later in the day, because it's no big deal. And these Miranda rights are procedural. They're not a big deal. They didn't care. They, they were procedural paperwork, unimportant. The mere fact that the truth is they were never going to stop questioning defendant. And even if she invoked her rights, they wanted to get the answers they wanted to get. And even when she said, I want a lawyer, they still continue to question her. Now the trial court did suppress the statements made after the time it was three 30 in the afternoon. Um, when they came back and off the roof, um, they went back into the interrogation room. It did suppress those statements made after she said, I want a lawyer. But my point is, and I believe that was proper, but I feel like the court should have gone further and realize that the Miranda rights, she said she didn't know what they meant. She didn't know she was confused. She didn't understand. And they, they classified it as procedural and no big deal. I feel like she really, they, they didn't, they didn't care throughout the day, but the rights didn't mean anything at any point in time and all of the statements should have been suppressed. You believe that her statement, do I need a lawyer is an unambiguous request for an attorney. Are you arguing that your honor? Really? It's, it's the second statement where she says, when they go back into the interrogation, she says, I, I, I need a lawyer to discuss. I need a lawyer to discuss the charges that I'm facing. Um, I believe it's at that point in time that judge bear civic suppresses the statements that come thereafter because there's quite a, quite a bit more of interrogation after that period of time where they take no notice of her indication, um, and, and desire for an attorney. The Davis case has got the plane. We forget the Davis case. Yeah. The interrogation must cease, must cease. The interrogation must cease until an attorney is present. Only if the individual states that he wants an attorney and I get the trial judge heard that language and stopped it right there. You're saying need and want are the same or to be equated. I need an attorney. I want an attorney. Should I have an attorney? Which one is the unambiguous request? Um, and I, I'm not quibbling, I suppose with, I'm not trying to evade your question. I'm not really, I believe that the trial court properly suppressed the statements made after that point in time, I guess, regardless of whether it was need or want. So I, I think that judge versus a correctly determined that absolutely at that point in time, the statements needed to be suppressed, but I do think that the suppression should have been given, um, should have been broader. It should have been broader. It should have included statements made earlier. Um, certainly based on, um, her statements when she was Miranda iced. Okay. And, and her children, she wanted to talk to your children's things, right? I believe that the statements really, with regard to the time that she was Miranda eyes are the most telling. I merely mentioned, uh, or display to you that she said those words, I need to be with my children. I want to be with my children. I want to go home. I want to leave all those statements. It's just the repetitive nature of it. She, she said those things a dozens of times that day. Um, do they invoke, um, the magic words under Davis? Arguably no, but, um, I think under the totality of the circumstances, especially in light of her response to her Miranda rights being read to her in the beginning of the interrogation on January 4th, I think that, um, the statement should be suppressed. Ms. Comerick, I have one question. Um, at the point in time on the fourth, when, um, she asked again, can I go home now? And the investigator Schrader said, yes, you can go home. Um, what further should they have done at that point? Why didn't she get up and walk out the door when he, I'm sorry, was that on January 3rd? No, it's on the 4th on the 4th, but it's before the trip to the roof. I think, um, I think that it's very similar to what happened the day before, um, that did they ever tell her directly that she could go home? I mean, I thought this was the first time she said, can I go home now? And they said, yes, you can go home. And what happened was if I, if I remembering the facts correctly, because she said that so many times and they use different tactics to kind of gloss over it, um, or say, yeah, yeah, yeah. But they, he left, she sits there, um, and then another police officer comes in and continues the question. But are we supposed to consider her subjective passivity that you're, you're trying to portray her as, you know, a very passive person that, um, even though she's told she can do something that I guess she needs to be invited? I understand. I think it goes back to my argument made regarding January 3rd, which was, um, did she feel, uh, when he says, sure, you can go home and almost as if he gets up to, okay, go do paperwork and I'll be back. That type of thing. I think that there was the oppression she got because again, she's in a, uh, upstairs interrogation room, past security down the hall, the stairs, that type of thing. I don't think that she felt like she was free to leave without being escorted out of the Sheriff's department, um, whether she was in custody or not on January 4th. Um, I think the argument is the same with regard to that, that she felt unfree to go. Okay. Thank you. We'll have a brief rebuttal. Thank you. Mr. McCormick, when you're ready, begin, please. Your Honor's counsel, um, there were two interviews, the third and the fourth. On the third, the court found that the defendant was not in custody and doing a de novo review of the ultimate issue, as this court's proposed to do, uh, and looking at all the factors and applying an objective test, since the, uh, test is with a reasonable person and all wrongdoing have felt restrained or in custody. Um, and looking at those facts, uh, the courts, the courts finding that the defendant was not in custody is, uh, correct. Um, first, the defendant drove herself to the interview. At the interview, the officers told her, uh, that they didn't know how the fire started and, or how the victim had died and, uh, that they had no grounds to charge anyone. So, you know, an objective person hearing that, innocent of all crimes, wouldn't have thought they were in custody. Um, she wasn't a suspect, uh, and there was no suspicion of crime at this point in time. She was in an unlocked room, they have video shows, and she's left alone for a lengthy period of time, uh, aggregate around a half an hour. And she walks in and out. She makes, she receives phone calls on her cell phone, uh, and takes them. Uh, and in fact, she's the one who terminates the telling the person on the phone, uh, let me get finished with what I'm doing and then I'll call her back. So, I mean, she's obviously there voluntarily, uh, and she wants to answer the questions. She doesn't feel like she's under suspicion, uh, under the circumstances, the objective circumstances of this, uh, case. Um, she, um, the officers didn't press her. They were exculpatory narrative of what had occurred. Uh, the questioning itself wasn't long. In fact, the majority of it wasn't really questions about questioning by the police officers, but by the fire marshal despot. And she left when she was ready to. So clearly, you know, looking at all those facts, factors, uh, objectively, uh, she was not in custody. And the court's finding that she was not in custody is correct. And for that reason, since she wasn't subjected to constructive interrogation, uh, Miranda warnings were not required on that day. The second day on the fourth, um, she was transported to the same, uh, room, to the same, uh, police station. And she was interviewed in the same room. Um, she didn't arrive in her own car. So circumstances are somewhat different. Uh, at that point in time, uh, the autopsy results were back, were back and the officers did have, um, reason to believe that it had been a homicide because the victim had been shot and then the fire had been started. Um, but they did not place her under formal arrest until sometime in the middle of this, of this interview. Uh, but to that point, she seemed to voluntarily answer all questions. She was given her Miranda rights though. And, and it was told, she was told this is just procedural at that point. Uh, the officers didn't think that she was in custody and that she would be leaving the station and that this was just an investigatory questioning. Um, I can't remember. Did they receive information at that point that made them believe that the autopsy, the autopsy had been completed? I don't know. They knew that report on the date not on the third. No, I know. But was it sometime during the, uh, the interview or did they know beforehand that the autopsy had been concluded? It may have been during, but it, it, it, it was certainly that they were, they knew that they had a homicide at that point, uh, uh, a possible homicide. And then they set the car to pick her up then? Yes, they did. They did. So the factors are different. Yes, I agree. They knew there was a gun then, there were bullets there at that time. But there were guns found in the, in the, in the, at the scene. Uh, they didn't know that those were, had been, they didn't know that there hadn't been any forensics done on the guns at the scene at that point. So, um, but, but during the initial questioning, she's given Miranda and she is, uh, she, she signs initials and signs and the waiver. Uh, and she seems to, uh, voluntarily answer the questions that she's given and she sticks to her, exculpatory story all the way through. And, uh, toward the middle, she, she asks to go. And up until that point, you know, she's making, I need references, I need to be with my children, but this is an unequivocal request that, that, that questioning ceased. Uh, I need to be my children, to need to be with my children is more, uh, uh, a mental comfort here than it is an objective expression, uh, that she wants the interrogation to cease. And, and it needs to be an objective, unequivocal expression. Otherwise the, the rules of Miranda are not, not applicable. They're, they're not workable. And so for that reason, her, her, her, the court below found that her, uh, expressions of a need to be with her children did not equate to, uh, an, an expression, an unequivocal expression, uh, that she wants the interrogation to cease. Um, and, and that, that this court should affirm that, that finding. Um, she isn't told that she's, she, well, at some point she's told that she can go. And at that point, Poundel, who has left, comes back in and informs her that because she was the last person to go into the house or be at the house before the fire started, that they're going to place her to formal custody. And she, at that point, she is in formal custody. Um, whether she was in custody before or not does not matter so much to the analysis because she was given Miranda and she was, uh, she did waive her rights and she did answer questions up until that point. Then after she is, uh, after she's put under formal arrest, that's when she asked to go out and smoke. And they do go out on the roof and smoke. And she's treated politely and civilly the whole time. Um, she has initialed, uh, the Miranda waiver form next to each warning. She did not sign the second warning, but she could, but by her actions, she has waived it because she continues to talk. Uh, she goes out and she has a conversation on the rooftop and that's reported. And then they come back in. She wasn't an attorney then. No, she doesn't ask. She says she makes unequivocal. I mean, she makes equivocal statements like, um, do I need an attorney and or, uh, nothing that specifically requests an attorney in an affirmative way. It's a question. And the officer answers her questions with this is your decision. I can't tell you what to do. This is your decision. I can't tell you what to do. And the defendant is 32 years old. She has a GED. She didn't really complete high school, but she has video there. There's a camera there. There's also a camera there. Right. Video there. Correct. Correct. So, I mean, this court, I mean, the facts are not really an issue because this court has the facts before it just the same as the court below. And for that reason as well, de novo review is appropriate. Uh, but she doesn't have any mental deficiency. She's not a minor, which would call into question whether it was a reasonable minor in custody. She is an adult. She has, uh, she apparently has driver's license. She's driven to there. She doesn't seem to have any problems understanding or answering questions. And she seems to be perfectly willing to answer the questions. The court found that even though at 332, when she did make an unequivocal request for counsel, that nonetheless her conversations with the, with the, uh, officers thereafter, uh, although in violation of her rights were voluntary. So there's no, there's no coercion going on during, during this procedure. And she does seem to understand what she's saying and what her position is. I mean, she certainly understands she's being talked to about the death of her husband and the fire. And ultimately she does admit on the rooftop at a second smoking session, she admits, uh, to shooting her husband and to she's brought back in and she readmits, um, in the video audio video section, the same thing. And, and doesn't deny that she cut the gas line that just basically says she doesn't remember doing that, but she does admit that she set the fire. Um, so there is no, there's no reason for, uh, where she does make an unequivocal request for counsel. And this court should affirm the court below, uh, on its, on its ruling. Uh, I don't believe counsel got to, uh, the second issue, which was, uh, for the request for counsel, the counsel at sentencing. And for that reason, people won't address it and we'll rest on your brief. Any questions? No. I just want to point out to the court. Um, and I know you've all been to St. Clair County. This was a suspicious fire from the get go. Okay. Um, even on day one, this was an interview to get answers from the defendants, not for the defendants, from her. Okay. Day one, I would not say that there was no suspicion of a crime. They knew that that fire was set. They knew that the gas line was cut suspiciously. They had an understanding that there was a good probability that this was and that someone was killed. Um, they were asking her questions about a suspicious fire. Make no mistake about it. This wasn't just come on in and let's, you know, be saddened by her husband being dead and let's just, you know, make arrangements. This was, I want to know what happened that day. I want to know where you were. I want to know where everyone else was, where your exhibit 18 is dated on day one, January 3rd. Later in the day, after they had let her go on the first day of questioning, they find out that Mr Shepherd was shot and killed. And they also have a conclusion that the first shot, not the fire and not the second shot killed him. They know that he was murdered. Okay. Um, so on day two, January 4th, um, they knew why they were taking her into custody. They were directing their questions to her, um, to get answers and to implicate her or to have her implicate herself. Um, they went into day two with and throughout day two with an intention to arrest and charge her. Um, I, I just disagree with the way it was, it is, uh, described, I guess, by, by counsel. Um, to be honest, I, I don't know if, um, it's proper to go into the second issue given that counsel does not have, um, a chance to respond, but, um, it's very brief and just saying that Cindy was given really one option that day. She, she moved for or asked for a brief continuance to get a different counsel for sentencing. Um, the trial court denied that. So she had two choices. One was to proceed per se, which she really was not able to do. Number two was to proceed with counsel that she did not wish to proceed with. So that is what she did. So I believe that that was an abuse of the trial court's discretion. Um, in conclusion, um, I think that it's clear that defendant's right to be remandized while in custody on day one, um, and her right to remain silent and her right to an attorney, uh, were violated during the two days of questioning. Um, I also assert that her right to an attorney of her choice at sentencing was violated. And as such, I ask that the case be suppressed, um, and or that the case be remanded for resensing. Thank you very much. So nobody feels bad if the state wants to make one statement on that. There is a little confusion on that. I normally would allow it even if it hadn't gone into, but since you had the impression it wasn't, but limited to a couple of sentences. I will read your brief. The defendant was not entitled to, uh, appointment of counsel at that point in time because she was indigent. She, she had no ability to hire a new counsel and for more, uh, to have been a continuance. Uh, this was a month later and she, uh, she could not stand up and represent to the court that there was counsel ready and willing and to enter appearance and continue. Therefore, the court was correct. Okay. Well, I want to thank both of you for your arguments in this case, uh, and the briefs that you both submitted. We will take it under advisement and try and provide you a decision as early, early as possible date.